ALLEN vs. JAQUISH.

A contract *not under seal*, rescinding a specialty, where such contract is fully *executed* and carried into effect, is valid. So a contract under seal cannot be set up in bar of a recovery, on an implied promise to pay for work done, stipulated for in the contract, but performed at a time and in a manner different from its provisions, *accepted* however by the other party; but a *specialty* cannot be modified by a *parol* or *written* unsealed *executory* agreement.

*It was accordingly held*, that a subsequent *unsealed* agreement, to relinquish upon failure to perform certain stipulations, a lease duly executed *under seal* for a term of years, was inoperative as a *defeasance*, but valid as a contingent *surrender*, the latter being deemed a conveyance *in præsenti*, to take effect *in futuro*.

It is not indispensable to the validity of a contract, that the cause moving to the act should be *mentioned as the consideration*; it is enough if from the whole instrument it be manifest that there is a consideration.

*Notice to quit* is not necessary, where the terms upon which a lease is to terminate are fixed by the agreement of the parties.

THIS was an action of ejectment, tried at the Delaware circuit in May, 1837, before the Hon. JAMES VANDERPOEL, then one of the circuit judges.

Allen v. Jaquish.

On the 25th August, 1834, an agreement *under seal* was entered into by the plaintiff and '*John Jaquish, junior,* whereby the plaintiff bound himself to furnish a mill on a certain stream and as much timber as could be cut and sawed into lumber and manufactured into shingles by Jaquish *during ten years* next ensuing the date of the agreement, from certain specified lots ; to keep the mill in repair, and within one year to make a good road from the mill to the river *Delaware*—giving by the agreement *immediate possession* to Jaquish of the mill, mill-lot and house, and authorizing him to clear as much land as he saw fit. Jaquish on his part agreed to erect *two shingle machines* and put them in operation in the mill by the 1*st June*, 1835, to keep them in repair or supply their places, and to saw as much lumber and manufacture as many shingles as could be made during the stipulated time : for which privileges he agreed to leave at the mill *one-third* of all the lumber and shingles which should be manufactured. By an agreement endorsed on the above instrument, the plaintiff authorized Jaquish to have a *jack* made at the expense of the plaintiff. In October, 1835, another agreement in writing, but *not under seal*, was signed by John Jaquish, jun. whereby, after reciting the former agreement on his part to put up two shingle machines in the mill of the plaintiff, he stipulated as follows : " I do hereby engage, if I do not put up the said shingle machines in the said mill and get them in operation by the first day of June, 1836, I will then *relinquish the contract* and give up every thing I have done, and leave all things on the premises, provided I shall be entitled to receive two-thirds of all the lumber sawed at the mill until the said first of June, 1836." The shingle machines not being erected and put into operation by the first day of June, 1836, the plaintiff caused a *notice to quit* to be served on *John Jaquish, jun.* on the *tenth* day of June. A similar notice having two days before been served upon *Cornelius Jaquish* and *John W. Jaquish,* who were made defendants *jointly* with John Jaquish, jun. in this action, which was commenced shortly afterwards ; the declaration being returnable at July term, 1836.

The plaintiff having rested, the defendant's counsel asked for a nonsuit on the following grounds : 1. That the suit

was prematurely brought under the notice to quit ; 2. That the plaintiff had failed to show performance of the stipulations on his part as contained in the contract, as to the making of a good road, &c.; 3. That there was no proof of a *joint* possession of the premises by the defendants in the action ; and 4. That the second agreement was void, being without consideration and not sealed. The judge refused to nonsuit the plaintiff. The defendants then offered to prove non-performance of sundry stipulations in the contract on the part of the plaintiff ; which evidence being objected to, was rejected by the judge. The evidence of a *joint possession* of the premises by the defendants resting in circumstances, the counsel for the defendants asked the judge to require the plaintiff to *elect* against which of the defendants he would proceed, insisting that a *joint possession* had not been shown, or to nonsuit the plaintiff. The judge refused to do either. Whereupon the cause was summed up and the jury found a verdict for the plaintiff against all the defendants ; who now moved for a new trial.

*A. J. Parker*, for the defendants.

*M. T. Reynolds*, for the plaintiff.

*By the Court*, COWEN, J. [After ruling *against* the defendants the minor objections raised in the case : such as that a *joint possession* was not shown in the defendants, and that the evidence offered of non-performance, by the plaintiff of the stipulations in the first contract on his part agreed to be performed ought not to have been rejected, the judge proceeded as follows :] The *second agreement* was, I think, *valid*. One objection raised on the argument was, that the agreement not being under seal, it should have expressed a consideration. It was evidently intended as a modification of the first agreement or lease. It was signed by the defendant, John Jaquish, jun. the original lessee, and accepted by the plaintiff on account of the delay and non-performance ; perhaps, of both parties. John Jaquish, jun. deeming himself most in fault, agreed, on ac-

count of his non-performance, mentioned in his second agree-
ment, to repair the omission by a given day, or relinquish
his original lease.   He meant the last contract should operate
as a part of the first; and the motive or consideration is plain-
ly enough collectable from the face of the new contract.   He
was to have a share of the lumber sawed at the mill in the
mean time, and the plaintiff had been damaged by the breach.
Here are two concurring considerations, the satisfaction of
damage to the plaintiff, and a clear right or benefit acquired
by John Jaquish, jun.   It was not necessary that these should
be expressly mentioned as the consideration.   It is enough
that they are obviously so in fact, from the recital and nature
of the instrument.

If the lease became void, in consequence of not fulfilling
the second agreement, or, if the latter operated as a *surren-
der*, the case was not one in which any notice to quit was
necessary.   That is never required where the parties have
by mutual agreement fixed the terms on which the lease is
to terminate.   The lessee may always waive the right to re-
quire notice; and for the same reason, the right never arises
where a lease for years expires by its own limitation, or the
parties have otherwise made an end of it.   *Conventio vincit
legem.*   If a party has, in any form, transferred all his in-
terest to another, he is bound to quit the possession.   If he
do not, an ejectment lies against him immediately. .

The important question is, in what way did the second
writing between these parties operate?   Did it enure as a
mere promise, a defeasance, or modification of the lease; or
was it a surrender?   If a mere promise, ejectment will not
lie upon it; but only an action of assumpsit.   To warrant
the present action, therefore, it must have operated to extin-
guish the lease, or pass the interest of the lessee to the plaintiff.

There is no doubt that the parties intended the second
instrument as a defeasance; but I think they failed in the
attainment of that object.   The instrument is not under
seal; and for that reason, it is impossible, without a de-
parture from a long line of direct and unbroken authority,
to give it effect as a modification or defeasance of the lease,

which was sealed by both parties. The cases of *Lattimore* v. *Harsen*, 14 Johns. R. 330, and *Dearborn* v. *Cross*, 7 Cowen, 48, are relied on as showing that a specialty may be modified by a simple contract between the parties. If these cases be maintainable, and I think they are, it must be on some other ground: perhaps that of a contract for rescision, executed and fully carried into effect; not on the simple idea of modification by a parol contract executory. And they were so regarded in the subsequent cases of *Suydam* v. *Jones*, 10 Wendell, 180, 184, *Barnard* v. *Darling*, 11 id. 28, 30, and *Delacroix* v. *Bulkley*, 13 id. 71, 75. In these, we have Mr. Justice Sutherland, Mr. Justice Nelson, and Chief Justice Savage, successively disavowing the doctrine that parties can modify their agreements under seal, by any subsequent agreement without seal. And any one will feel clear, on an examination of the books, that these learned judges could have done nothing less, without a rash disregard of the very highest and best evidence which we have of the law. They adverted to the authorities, at the pages which I have cited. The same authorities, or nearly the same, will be found cited and approved in the following books: 1 Phil. Ev. 563, 7th Lond. ed.; id. 774, 8th Lond. ed. by Amos & Phillipps; *Creig* v. *Talbot*, 2 Barn. & Cress. 179. In *Braddick* v. *Thompson*, 8 East, 344, 346, it is said, "all the court were satisfied, that the defendant could not plead a collateral agreement by *parol*, to invalidate a claim arising upon deed." It is the same whether the collateral agreement be in writing or not; for " in the classification of contracts, an agreement *in writing* not under seal, is denominated a parol contract." That was said in *Ford* v. *Campfield*, 6 Halst. 327, which may be added as another case in point to the question now before us. *Sinard* v. *Patterson*, 3 Blackf. 353, 357, is also in point. There Blackford, J. said: " There is no principle of the common law better settled, than that an agreement under seal can only be dissolved *eo ligamine quo ligatur*." There are certainly several *dicta* to the contrary; some emanating from learned judges of this court, which led Mr. Justice Nelson to observe, in *Barnard* v. *Darling*, that the cases seemed to

have left the doctrine in a little obscurity and doubt. That is, indeed, true; nor are we without direct authority against it. *Deshazo* v. *Lewis*, 5 Stew. & Port. 91. Most of the cases, however, supposed to bear against it, go no farther than to say, that where the agreement under seal is departed from in the mode or time of its performance, and yet the performance is accepted as satisfactory, although an action of *covenant* will not lie, the acts of the parties shall be considered as evincing an executed agreement to rescind the covenant. The person sought to be charged having acceded to the departure, and equity, conscience, and good faith, therefore, demanding that he should make compensation, the law raises an implied promise to pay. Such was the case of *Jewell* v. *Schroeppel*, 4 Cowen, 564, and numerous other cases which are quite familiar to the profession. See *Munroe* v. *Perkins*, 9 Pick. 298. The action is purely equitable, being the same in principle as that for money had and received. What effect the acceptance of an imperfect performance as a substitute for a literal one, would have upon an action for a breach of the covenant itself, has not, that I know, been adjudged. In *Jewell* v. *Schroeppel*, it appears there had been a recovery in a cross action for the breach. But why should not an actual performance and acceptance of the substituted performance operate as an accord and satisfaction? The inquiry, however need not be pursued.

The whole doctrine as to the effect of the instrument now in question, by way of modifying the lease, indeed of defeasances generally, will be found in Shep. Touch. 396, ch. 22. The very learned author of that book agrees, that all executory contracts, among which he includes leases for years, may be annulled by a defeasance, which he says may be and usually is executed subsequent to the instrument which it is intended to defeat. But then he lays down the requisite, without qualification, " that the defeasance be made *eodem modo*, as the thing to be defeated is created; for if the obligee by *word only* discharge the obliger, or grant not to sue him, this will not defeat the obligation; it must be by deed therefore as the former was." By adopting the au-

thor's remarks, we take the most favorable view for the plaintiff in the case at bar; for the author tells us in the same chapter, that a defeasance subsequent is confined to contracts executory; whereas, contracts executed can be touched only by a defeasance cotemporary with the original deed, and making a part of it. It is well known that in the time of Mr. Justice Doderidge, to whom the Touchstone is ascribed, leases for years had not entirely ceased to be considered as merely executory contracts, defeasible by the lessor in despite of the lessee. Since they have come to be regarded more as contracts executed, and carrying an interest in possession, it may be well doubted whether a defeasance subsequent may be predicated of them. In *Creig* v. *Talbot*, where sealed bonds of submission to arbitrators were held capable of a modification by a sealed contract subsequent, postponing the time of hearing, Holroyd, J. said, " The distinction is between things vested and things executory, as in a feoffment of lands. There the estate is vested in the feoffee, and therefore the condition is void. But a bond is executory, and may be defeated at any time by deed, although not executed at the same time with the bond. Again; the second agreement of Jaquish is not expressed so as very clearly to declare that the lease should be void, if the machines were not completed by the time. He merely agrees thus : " If I do not put up the said shingle machines, &c., by the 1st day of June, 1836, I will then relinquish the contract, [lease,] and give up every thing," &c. Taking the whole together, however, if it had a seal, I agree we should regard it as indicating an intent that a failure should operate as a defeasance, and then we might possibly give it effect accordingly. But the want of a seal is an insurmountable obstacle. When the time came, the lessee refused to surrender the premises, and kept possession.

The second agreement thus failing to operate as a defeasance, the next question is, whether it could operate as a contingent surrender, it being in the nature of a re-demise. There is no doubt that either a surrender or demise may be effected by a simple writing not sealed. *Magennis* v. *MacCullogh*, Gilb. Eq. Cas. 235, 6. Co. Litt. 338, *a*. note (1).

*Farmer* v. *Rogers* 2 Wils. 26. The operative words of a surrender are, " hath surrendered, granted and yielded up." 2 Black. Comm. 326. Co. Litt. 337, *b*. Woodf. Land. and Ten. 185, Lond. ed. of 1804. There is no doubt, however, that a surrender may be effected by equivalent words; and when complete it is as it were a *re-demise*. Woodf. Land. and Ten. ed. before cited, 186. Perk. § 607. It may be made upon condition; that is, to become void upon condition. Perk. § 624. And though no case goes so far as to say that a surrender may be made to become good upon condition precedent, yet there seems to be no objection to that in principle, if the interest surrendered be not a freehold. That cannot in general be granted so as to take effect *in futuro ;* but a term for years can. The surrender of a term to operate *in futuro* is equally free of the objection. Contracts of parties, whether by deed or otherwise, shall always take effect according to their real intent, if that be possible consistently with the rules of law. In *Whitlock* v. *Horton,* Cro. Jac. 91, Mary Milton, by indenture between her and the defendant, covenanted, granted and agreed, that the defendant should and might, have, hold and enjoy, from and after the death of E. W., the moiety of certain lands for sixty years, &c. And it was held that these were apt words to make a lease for years, and might enure as a lease *in futuro*. *Richards* v. *Sely,* 2 Mod. 79, is a like case. And there, Maynard, Serj. conceded that the word " covenant" would of itself make a lease, which is adopted and repeated in Woodf. Land. and Ten. 7, Lond. ed. 1804. The latter author, at p. 6, says it is a general rule, " that whatever words are sufficient to explain the intent of the parties, that one shall divest himself of the possession, and the other come into it, for such determinate time, whether they run in the form of a license, covenant or *agreement,* are of themselves sufficient; and will, in construction of law, amount to a lease for years, as effectually as if the most proper and pertinent words had been made use of for that purpose. Otherwise of the most apt words, if they appear to be only preparatory to a future lease to be made. Bac. Abr. Leases, &c. (K), S. P. We have seen that Wood-

fall, in another place, speaks of a surrender operating as of the nature of a *re-demise*. Suppose the owner of land promises another in writing, for good consideration, that on the other paying so much, he, the owner, will relinquish and give up the land to the promisee for ten years at such a rent. Is there a doubt, that on paying the money, the promisee might enter or bring ejectment as a lessee? I should think not. The case at bar is quite as strong; for the lessee agrees that if he fail to perform, he will relinquish his lease and give up every thing. No farther act is spoken of. The meaning was to annul and render the lease inoperative: and although it could not enure as a defeasance or as a demise, yet it may, I think, enure and take effect as a surrender, on the contingency happening. Test the case by the rule in Woodfall. Can any one doubt that the lessee intended to divest himself of the possession, and let the lessor take it for the whole remaining term of the lease? In this view the verdict at the circuit is sustainable, and a new trial must be denied.

New trial denied.